MORGAN *et al. v.* ETHERIDGE *et al.,* commissioners, etc.

No. 8836.   FEBRUARY 15, 1933.

*H. B. Moss* and *G. B. Walker,* for plaintiffs.

*J. P. Brooke,* for defendant.

RUSSELL, C. J.   This is the third appearance of this case before this court.   On July 30, 1929, Morgan and others filed a petition against Shirley as ordinary (and as such official in charge of the public roads of Milton County), for a mandamus to compel him to build a bridge across Big Creek.   Upon the trial of the case a jury found for the petitioners; and the ordinary, by bill of exceptions, brought the case to this court for review.   A majority of the court reversed this judgment upon the ground that the evidence was not sufficient to establish an implied dedication of all the land through which the highway extended and upon which the bridge was located.   A request to overrule or modify the decision in *Howell* v. *Commissioners,* 118 *Ga.* 635, was denied.   *Shirley* v. *Morgan,* 170 *Ga.* 324.   Upon a second trial, after the introduction of evidence, the court, on oral motion, granted a nonsuit, and the plaintiffs excepted.   The evidence in behalf of the plaintiffs, as reported in *Morgan* v. *Shirley,* 172 *Ga.* 727-731 (158 S. E. 581), is substantially the same as that introduced in the trial now sub judice.   This court held that the court erred in awarding a nonsuit, and remanded the case for another trial.   It was thus decided that the plaintiffs, upon the evidence adduced, without more, were entitled to prevail.   This, however, was not the equivalent of a holding that plaintiffs would be entitled to prevail, if issues of fact should be presented by the defendant disproving the statements made by the witnesses for plaintiffs, or if the jury should determine from evidence introduced by the defendant that the erection of the bridge and the continuance of the road would not be a matter of public necessity or utility.   The witnesses for the defendant, of course, were not heard upon the trial in which the nonsuit was granted; and this court was obliged

to hold, in the absence of any testimony contradicting or explaining that offered on behalf of plaintiffs, that a jury would have been *authorized* to find for the plaintiffs, even though a finding in their favor was not *demanded*.

O. C. Shirley, the ordinary of the county, testified that he was familiar with this bridge, and as to the condition of the road and bridge at the time he came in office, January 1, 1925. The road was somewhat muddy, and the bridge was crossable; later it became dangerous, and people told him he had better condemn it. It was made out of old field pine sleepers, and one of these broke. It was then he condemned it; put a written notice to notify the people it was dangerous. After that he did not "think the folks continued to pass over it very much; they passed there some." After he went in office they went over it with some machines and hauled some rocks in there. It got so they could not pass, and they hauled some rocks there and put them in the mud holes. It was not very long before they abandoned the road and bridge entirely; never worked on the road any more. After they tore some of the planks off, people told witness somebody would get killed or get their stock killed, and the county would have to pay for it. "Then I tore off some planks, tore some planks out of the bed. Then later on we tore the whole thing down. After the bridge had that broken sill on it there, Mr. Rayner and some others put some posts under it, . . and the first rain that came washed all of that out." The witness "did not recall just who did that," but the county did not have anything to do with it; "they said they would fix it. I did not notify Mr. Rayner before that we were not going to rebuild the bridge; we just did not rebuild it. . . This was about 1927 or 1928. . . While we had the matter under advice as to whether or not we would continue that road and bridge and take it over as a part of the county's road scheme, I undertook to find out how much it would cost to build a bridge, so that it would stay there. I knew at the time it had already washed away three or four times in a few years. I found it would cost $1400, the cheapest bid I got on it, to build a bridge that would stand. I went to Atlanta to get a man to come there to look into it. And to have fixed up that road there, a good road, through that swamp and on up around where it would go, I really think would have cost about as much as it would to build the bridge, I expect about a thousand dollars. You would have had to

have rocked it and then soiled the top. That was the condition there on both sides of the creek. . . I don't reckon I knew, at the time I bought it, about the previous owners of the Kimbell property and the others of property that the road went over, having made the road, dedicated that road over there. I don't reckon I knew anything about it when I bought it. I knew there was a road there, and a bridge, but I didn't know anything about the other. My understanding was they were to keep up the other bridge down there, the Kimbell bridge for the right of way through there. And if they kept up that bridge and road, I thought it was too much to pay for that down there."

Shirley further testified: The bridges which were washed away were located about 150 yards from the old Kimbell bridge. The Kimbell bridge was there something like forty years ago. He had some work done on the Kimbell hill since he had been in charge of the county's affairs, that cost about $30 or $35. That was grading the hill down and soiling it; cut the top of the hill off and pulled it down towards the bridge. It would not cost a great deal to grade the Kimbell hill down from top to bottom to a ten per cent. grade; it is pretty near that now; it would cost less than $100, even less than $50. Witness as ordinary tore down the bridge after it became dangerous and one of the sills broke. He really had contemplated building a bridge there, and had some sills and beams carried there, and sent the foreman of the road there to locate it and make arrangements to build the bridge, and the foreman said he could not put a bridge there that would stay. "I then went to Atlanta and got a regular bridge man to come up there, and asked him what he would put it there for; . . and he said he would put it there, at first he said $1500, and then he said $1400. I then decided to try to work out the old road and not put this bridge there. It looked to me like putting too much money in one part of the county, and other parts going without; and I thought I would try to divide the county money, as well as I could, all over it. I have built some steel bridges over the county, a good many. As to the cost of these bridges, it depends altogether on the beams and the foundations you have got to start on, and the length of the bridge, and the abutments. In this place in question you would have to put in concrete abutments or foundations, or driving piling. I think Mr. Austin, the bridge man, figured on using piling. That

is our big trouble in building bridges, is the abutments, something to tie the bridge to. My opinion is that to build a bridge like that in question would cost us a thousand or twelve hundred dollars, . . and I didn't expect to pay more than six or seven hundred dollars when we were talking about it." On cross-examination this witness swore, in regard to the abutments: "Here at this place we stuck a stick down there, and I expect that stick went eight feet, just in the sand. I don't know how much it would cost for abutments there at this place, not such abutments as they need there." Witness denied that he was influenced by selfish or pecuniary motives in working the road by the Kimbell property and refusing to rebuild a bridge and work the other road. "I thought may be I would put a bridge down there until I found it would cost so much, and I didn't think it was doing the people of the county justice to put that bridge there and pay that much for it at one place. . . Kimbell bridge don't wash away every time it comes a rain, and that one there was regular in washing away, and Rayner himself was afraid to take it. None of those people there tore it down and took it away. The sill pieces on the bridge were rotten and gave away, and that was what the top was resting on."

J. M. Dodd, county surveyor, made a demonstration of a road built upon a ten per cent. grade, and testified that a ten per cent. grade on a hill is a good deal of a grade, and that the steepest grade he ever heard of on a railroad was 80 feet to a mile. Further, that if one had an 80-foot hill, "to make it level you would have to cut it down 40 feet and fill in 40 feet down there. To reduce it 40 feet, you would have to cut it down 20 feet and fill in 20 feet."

Gunter, who worked for the county under Ordinaries Thompson and Douglas, and six and a half years under Ordinary Shirley, testified to the character and condition of the three bridges. He considered the place where these bridges were built "a pretty bad location, on account of getting a foundation for a bridge, on the west side especially; you can't get no foundation, and the bridge span is so long that you can't get a span to reach across it without having a bent in the center of the bridge and an abutment on this side. I don't know how far down you would have to go to get a foundation to set it on. I tested the ground there, out in the creek where they claimed there was a rock there where you could set a bent on it in the center of the creek. I drove down a rod there about six feet

long in the center, and I couldn't hit any rock down there at all.
. . Then the side there next to the abutment that was just soft
dirt there, when we built this bridge we just built a log-pen there,
let it run back on the bank, built logs on it, and laid the sleepers
on that. To put a foundation there to build a steel bridge you
couldn't trust that log; it would't be any good, wouldn't last any
time; the proper way to have a bridge built there would be to have
piling drove there and put the bridge on top of it. I think that
would be a very expensive job. The irons that were carried down
there at some time by the road hands were not long enough to build
that span, and that is why they were hauled away. That is a 50-
foot span bridge there, and those irons were 38 feet. We thought
we could find a rock out there to put the foundation on in the mid-
dle of the creek, and we couldn't find one; so we moved the irons
away from there. Mr. Rayner and I went there one time and
propped up the center of the bridge. We propped that up with
about two pine poles in the center, straight up and down; one under
the lower sill and one under the other one, in the center of that
bridge. Those sleepers there went plumb across, 58 feet long; they
was out of pine logs, and they didn't last any time. But when they
were put there, that was the best that the people around there could
do. The county didn't have anything to do with that; we got them
ourselves. The bridge lasted about 3½ years until it was con-
demned. After it broke down and got dangerous, me and Mr.
Rayner went down there and propped it up with some pine poles,
and that lasted some time. . . I was just working for the com-
munity down there when I helped build that bridge. I didn't get
any pay for it. Nobody employed us; the community just went in
there. . . I worked nine days there, and didn't get a nickel for
it, and nobody else got any pay. It wasn't me that wanted the
bridge there; it didn't benefit me a bit, I was just doing it for the
people across the creek, helping them to do it. They wanted it to
cross on, I reckon." There was a quagmire in the road into which
rocks had been hauled when the bridges were there which had been
washed away. Witness had known people to go up Kimbell hill in
cars in high gear, and had himself done that in the county truck.

Upon consideration of the evidence, it plainly appears that the
verdict in favor of the defendant was authorized. Though a verdict
in favor of the plaintiffs was authorized by the judgment of this

court upon substantially similar testimony, the jury evidently preferred the testimony in behalf of the defendant, which, if believed, tended to show that the ordinary acted in the exercise of a wise discretion, and not from motives of a personal character. The county authorities are necessarily clothed with large discretion in the expenditure of county funds. There was no contradiction of the testimony that to maintain a bridge at the point for which plaintiffs contended would have required the expenditure of a considerable sum, both in the erection of the bridge itself and the maintenance of the road constituting its approaches. The jury had before them the fact that there would be two bridges crossing Big Creek within 450 feet of each other; and this court can not say that the jury erred in finding, on one of the essential issues in the case, that the ordinary exercised a wise discretion in refusing to replace a bridge upon a road which, so far as appears from the record, had never been entered upon the registry as one of the accepted roads of the county.

*Judgment affirmed. All the Justices concur, except Atkinson, J., who dissents.*